# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00359-CV

---

### Theodore Reese Kerr, Jr., Individually; and
### Cowpuncher Investments, LLC d/b/a Cowpuncher Services, Appellants

#### v.

### Robert W. Lambert and Linda C. Lambert, Appellees

---

### FROM THE 33RD DISTRICT COURT OF SAN SABA COUNTY
### NO. 9656, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellants Theodore Reese Kerr, Jr., and Cowpuncher Investments, LLC d/b/a Cowpuncher Services (Cowpuncher), appeal from the trial court's judgment rendered after a bench trial in favor of Robert W. Lambert and Linda C. Lambert (the Lamberts) on their claims that Kerr and Cowpuncher damaged trees on their property while spraying herbicide. We will affirm the trial court's judgment.

### BACKGROUND

In August 2014, the Lamberts purchased approximately 125 acres of ranch land in San Saba County (the Property) intending to make it a country home for them and their son's family. After purchasing the Property, the Lamberts wanted to clear cedar and mesquite trees and remove post oak and live oak trees that had died on the Property as a result of a severe drought in 2011. The Lamberts also wanted to eradicate cactus that was growing throughout

the Property. In December 2014, Jim Bob Armes cleared cedar and mesquite trees from the Property. Armes said he could remove the cactus using a tractor and blade, but the Lamberts did not want to use that method because it would create large piles of dirt and dead cactus. Armes suggested that the Lamberts contact Kerr to see if he could kill the cactus using an herbicide. Robert Lambert contacted Kerr in December 2014. Kerr came to the property on December 15, and the two discussed the work and the fees Kerr would charge. Kerr stated that he would spray the cactus with an herbicide. The spraying commenced the next day and was completed by the first week of February 2015.

The Lamberts hired Buddy Miller to clear the property of the dead oak trees. In January, February, and March 2015, Miller cut and burned the dead oak trees. The work was delayed because of damage to Miller's equipment, but he returned to complete the burning in May and June 2015. By March 2015, Miller had cut down 470 dead oak trees that were on the Property.

In May 2015, Gary Jennings, who owned land adjoining the Lamberts and who had grown up in the area, visited Robert Lambert and told him that it looked to him like the Lamberts' oak trees were dying. Jennings believed that the trees on his land and on other adjacent land looked healthier than those on the Lamberts' land. Lambert and Jennings toured the Property and Lambert agreed that his trees looked different from trees on the adjoining properties and that it appeared that his trees had about one-third to one-fourth fewer leaves than the trees on the east side of his fence line. Lambert immediately called Kerr and told him about the apparent damage to his trees. Kerr told Lambert that he had sprayed an herbicide called Picloram 22K on the trees and that Picloram would not kill oak trees. Kerr called Lambert later

2

and told him that the person who had sold him the Picloram 22K had driven by the Property and did not think that Picloram caused damage to the trees.

Lambert then hired Michael J. Walterscheidt, an arborist, to assess the trees on the Property. Walterscheidt told Lambert that the oak trees on the Property were dying. Hoping that the trees would survive, the Lamberts waited until the spring of 2016 to reassess the trees. That spring, Walterscheidt returned to the property and he and Lambert tagged over 1,000 oak trees on the Property that were either dead or that, in Walterscheidt's opinion, had no chance of surviving.

The Lamberts sued Kerr and Cowpuncher in October 2016 alleging causes of action for violations of the Deceptive Trade Practices-Consumer Protection Act (DTPA), *see* Tex. Bus. & Com. Code §§ 17.41-.63, fraud, negligence, and negligent misrepresentation. The Lamberts alleged that Kerr, individually and as an agent for Cowpuncher, advised Robert Lambert that the main chemical that would be used to kill the cactus was Picloram, which Kerr assured Lambert would not hurt the trees on the Property. The Lamberts alleged that they relied on this representation and paid Kerr $23,400 to spray herbicide containing Picloram on the Property. The Lamberts alleged that despite Kerr's assurances, the Picloram solution sprayed on the Property "proved to be lethal to hundreds of trees" on the Property and that "at least 1,000 trees have been killed or severely injured in areas where [Kerr and Cowpuncher] sprayed the subject solution to eliminate the cactus." In October 2018, the Lamberts amended their petition to assert a cause of action for breach of contract, alleging that Kerr breached a contract "to safely apply a chemical solution to the prickly pear on [the Lamberts'] property."

After a bench trial, the trial court rendered judgment in the Lamberts' favor on each of their claims and awarded them $151,950 in damages. The court also awarded the

3

Lamberts' $34,526.38 in attorneys' fees, conditional appellate attorneys' fees, and pre- and post-judgment interest. After the trial court filed findings of fact and conclusions of law, Kerr and Cowpuncher perfected this appeal.

## DISCUSSION

On appeal, Kerr and Cowpuncher challenge the legal sufficiency of the evidence supporting a number of the trial court's findings of fact. They also challenge several of the trial court's conclusions of law. In an appeal from a bench trial, the trial court's findings have the same weight as a jury verdict. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). When the appellate record contains a reporter's record, as it does in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *See HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). The test for legal sufficiency is whether the evidence would enable reasonable people to reach the judgment being reviewed. *Id.* at 827-28. When the appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate that there is no evidence to support the adverse finding. *Pete Dominguez Enters., Inc. v. County of Dallas*, 188 S.W.3d 385, 387 (Tex. App.—Dallas 2006, no pet.). Such a challenge fails if

4

there is more than a scintilla of evidence to support the findings. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (more than scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Southwestern Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied). If the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822. We review a trial court's conclusions of law under a de novo standard of review. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

**Issue One—Challenges to Findings of Fact**

In their first issue, Kerr and Cowpuncher challenge the evidentiary support for several of the trial court's findings. Although Kerr and Cowpuncher do not specify in their statement of issues whether they challenge the legal or factual sufficiency of the evidence, or both, the standard of review set forth in their brief addresses only legal sufficiency challenges to evidentiary findings and they contend that "no evidence" supports the challenged findings. Moreover, in their prayer for relief, Kerr and Cowpuncher ask that we reverse and render judgment on the liability issues rather than reverse and remand. Because the former is the appropriate remedy for a legal sufficiency challenge, and the latter is only appropriate when we sustain a factual sufficiency complaint, we construe Kerr and Cowpuncher's arguments as challenging only the legal sufficiency of the evidence. *See French v. Moore*, 169 S.W.3d 1, 15

5

(Tex. App.—Houston [1st Dist.] 2004, no pet.) (parties' prayer for rendition presents legal sufficiency challenge). The challenges to individual findings of fact were presented as sub-issues A through J.

### *Legal Sufficiency of Findings Related to Reliance*

Section 17.46 of the DTPA provides a "laundry list" of specifically prohibited acts. *See* Tex. Bus. & Com. Code § 17.46(b); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 501 (Tex. 2001). The Lamberts alleged causes of action under DTPA subsections 17.46(b)(5), (7), and (24). To recover under DTPA section 17.46(b), a consumer must show that he detrimentally relied on the defendants' false, misleading, or deceptive act or practice. Tex. Bus. & Com. Code § 17.50(a)(1)(B); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823 (Tex. 2012) ("[U]nder 17.50(a)(1), a consumer loses without proof that he relied to his detriment on the deceptive act."). Lambert alleged that he relied on Kerr's assurance to him that Picloram would not harm his trees and that he would not have hired Kerr had Kerr disclosed to him that the herbicide he was going to spray on the Property could harm the trees or damage the Property. The trial court found that "Plaintiffs would not have engaged Defendant Kerr had they known that spraying with Picloram posed a danger to the trees on their property." Without further elaboration or briefing, Kerr and Cowpuncher assert in sub-issue A that the evidence presented at trial is legally insufficient to support this finding.

Robert Lambert testified at trial that when he first met with Kerr he asked Kerr whether the chemical he intended to use "would possibly hurt the trees and the answer was no." Lambert testified that Kerr stated that the herbicide he was going to use did not kill trees. Lambert provided the following testimony about his first meeting with Kerr:

6

Q: And what would you have done if [Kerr] had told you there was a chance of that spray hurting your trees?

A: I wouldn't have hired him.

Q: And why is that?

A: The trees are really valuable to me. I wouldn't take the risk of hurting them.

Lambert's uncontroverted testimony that he would not have hired Kerr if he had been told there was a chance that the herbicide Kerr planned to use on the Property would hurt his trees is evidence that is legally sufficient to support the trial court's finding. *See King Ranch*, 118 S.W.3d at 751. We overrule sub-issue A.

*Legal Sufficiency of Findings Related to Causation*

In sub-issues B and C, Kerr and Cowpuncher challenge the sufficiency of two of the trial court's findings related to causation. The trial court found:

> After [Kerr and Cowpuncher] had applied herbicide to [the Lamberts'] land and after [the Lamberts] had removed the trees that had died in the 2011 drought, hundreds of more trees died on [the Lamberts'] land as a result of the herbicide application.
>
> The herbicide [Kerr and Cowpuncher] sprayed was harmful to the trees on the land, eventually killing numerous trees belonging to [the Lamberts] and damaging [the Lamberts'] land.

At trial, several witnesses provided testimony regarding whether the herbicide application killed or damaged oak trees on the Property. Michael J. Walterscheidt, an arborist with a Master of Science degree in both Forestry and Plant Pathology and a doctorate in Plant Pathology, testified that, in his opinion, 1,010 trees on the Property, which he had catalogued and identified in an exhibit admitted into evidence at trial, were killed or damaged by the herbicide applied to the

7

Lamberts' land in December 2014 through February 2015. Walterscheidt testified that his opinion was based on his observations that (1) in May and early June 2015, after the Lamberts had cleared the trees killed by the 2011 drought from the Property, more trees on the Property were dead or dying, (2) there were no newly dead or dying trees on adjoining properties; (3) the presence of dying trees "stopped" at the Lamberts' fence lines, and (4) there was a correlation between sick and dying trees and the presence of dying prickly pear cactus under those trees. Walterscheidt also testified that he based his opinion in part on the fact that the label for Picloram 22K, the herbicide that was sprayed on the Property, states that it "controls" live oak and cautions against spraying under "desirable" trees. Walterscheidt also determined that there was no oak wilt present on the Property and eliminated that disease as a possible cause of the trees dying.

Gary Jennings, an adjoining landowner whose family had owned land in the area, including the Lamberts' property, since the 1920s, testified that he did not notice any significant tree death on the Property after 2012 until he noticed trees dying on the Property in May 2014. Jennings stated that the 2011 drought in the area was severe and damaged blackjack oaks, post oaks, and ultimately live oaks, but that by 2014, there were no more trees dying due to the drought. Jennings testified that when he noticed trees on the Lamberts' property dying in May 2015, he alerted Robert Lambert of the issue and the two of them toured the Property. Jennings observed that where there was prickly pear cactus that was dead or dying, the trees nearby were also dead or dying and that in areas where the cactus was "alive and well," the trees were also "alive and well." Jennings stated that he was aware that the Lamberts had cleared the trees that died after the 2011 drought in the summer of 2014 and that the trees that remained on the Property had looked healthy until May 2015. Jennings testified that in May 2015, the trees on

8

his land and the land east of the Property looked healthier than those on the Property. Jennings had observed the herbicide application on the Property in early 2015 and described it as "pretty broad" spraying, using a large industrial sprayer from the back of a pickup truck. Jennings testified that he believed that because the trees near cactus that had been sprayed were mostly dead and the trees near cactus that had not been sprayed were "alive and well," it was the application of the herbicide that caused the trees on the Property to die.

Kerr and Cowpuncher argue that Walterscheidt's and Jennings' opinions that Picloram killed the oak trees is only "circumstantial" and was contradicted by evidence that there is "zero chance" that Picloram killed the trees; evidence that a reasonable factfinder could not disregard. Kerr and Cowpuncher point to evidence presented by three witnesses—Zane Willard, Troy Ruffin, and John Begnaud.

Zane Willard is a regional manager for Alligare, LLC, the company that manufactures the herbicide used on the Property, Picloram 22K. Willard has sold range and pasture herbicides for ten years and is a specialist for all range and pasture herbicides used in Texas, Oklahoma, and New Mexico. Willard testified extensively about the label for Picloram 22K. Willard stated that herbicide labels are "the law" when it comes to application and use and failing to use an herbicide according to the label is illegal. Willard testified that Picloram is used for broad leaf and cactus control and that he is not aware of any instance in which Picloram has killed a tree. Willard stated that he often sprays Picloram over the tops of oak trees with "zero fear" that it will hurt or kill the trees.

The label for Picloram states that it is a "restricted use" pesticide that "may injure (phytotoxic) susceptible, non-target plants." The label states that Picloram is used "[f]or control of susceptible annual and perennial broadleaf weeds, woody plants, and vines," that it is "toxic to

9

some plants at very low concentrations," and that "non-target plants may be adversely affected if pesticide is allowed to drift from areas of application." The label instructs that it not be allowed to contact "desirable broad leaf plants including, but not limited to . . . shade trees." The label also states that "[u]ntreated trees can occasionally be affected by root uptake of herbicide through movement into the topsoil or by excretion of the product from the roots of nearby treated trees. Do not apply Alligare Picloram 22K within the root zone of desirable trees unless such injury can be tolerated." Listed among the woody plants "controlled by Alligare Picloram 22K" are "oak, live" and "oak, spp."

When asked about the label, Willard testified that the reference to "oak, live" and "oak, spp." in the list of woody plants controlled by Picloram meant that Picloram is used for "oak suppression"[1] using the "broadcast stubble treatment" method described elsewhere on the label, which he testified was the "specific rule" on the label for oak trees.[2] Willard agreed that any herbicide, such as Picloram, can affect any plant if used in high enough concentrations and that Picloram could affect trees through their root system. When asked about the label's caution against allowing Picloram to contact desirable trees such as "shade trees," Willard stated that you

---

[1] In other sections of the label, the word "suppression" is spelled out, not abbreviated as "spp." Walterscheidt had testified that the Picloram label states that it controls "live oak and other oak species." Walterscheidt's testimony that "spp." indicates "species" as opposed to "suppression" is consistent with the dictionary definition of "spp.". *See* Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/spp. (last visited October 20, 2020) (defining "spp." as abbreviation for "species (pl)").

[2] The label does not state that the "broadcast stubble method" is the only way that Picloram can be used to control oak trees or that using Picloram pursuant to the "broadcast stubble method" is the only way that Picloram can control or cause injury to oak trees. Instead, the "broadcast stubble method" is included in a section describing "special application methods" as a way to "prevent resprouting of susceptible woody species after mowing or hand-cutting on non-crop areas and rights of way."

10

could debate the definition of a "shade tree" but that he has and would recommend using Picloram around oak trees and that Picloram causes "zero mortality" when used on trees.

Troy Ruffin is an outside sales representative for Animal Health International and sold the Picloram to Kerr and Cowpuncher that they used on the Property. Ruffin testified that he has observed the use and effects of Picloram on range land and that according to the label it is safe to use around live oak trees. Ruffin stated that the way to kill an oak tree with Picloram is by cutting the tree and applying Picloram to the stump. Ruffin interpreted the term "oak spp." on the label to mean Picloram can be used for oak tree "suppression," which he testified meant "keeping it at bay" rather than killing it. Ruffin stated that he has seen Picloram cause damage to a tree's foliage but never kill a tree. Ruffin testified that he visited the Property after it had been sprayed, and he did not notice that the trees looked any differently from the trees on adjacent properties. Ruffin observed some live trees that had dead cactus under them but did not recall seeing any living cactus under any dead trees. Ruffin testified that he told Kerr he believed the dead trees on the Property had died because of the 2011 drought but admitted that he was unaware when he made that observation that the Lamberts had already cleared the Property of trees that had died because of the 2011 drought.

John Begnaud has a Master of Science degree in horticulture and was a horticulturist in San Angelo for 33 years. Begnaud visited the Property in September 2016. Begnaud testified that the trees on the Property had thinned and weakened canopies and that the Property looked similar to other land in the area where the trees had succumbed to injury from the 2011 drought. Begnaud stated that the Property seemed to have a similar number of dead trees as other land in the area that had trees killed by the 2011 drought. Begnaud observed trees on the Property that had hypoxylon canker, a disease caused by secondary pathogens to

11

which drought stricken trees are susceptible. Begnaud stated that he was unaware until trial that the Lamberts had already removed the trees killed by the 2011 drought in early 2015.

Begnaud testified that if Picloram was misapplied, it could cause injury to a tree but that it was not "a true killer of oak." Begnaud stated that trees that were stressed because of a drought or other disease or by a late freeze could be more susceptible to injury, but that it is "a cumulative thing" and he could not identify one discrete cause of tree death. In Begnaud's opinion, many factors were at play that caused the trees to be weak and although people might have their opinion, he didn't think that anyone could say that it was definitively Picloram that killed the trees. Begnaud explained that each tree is genetically different causing them to respond differently to and have a varied susceptibility to Picloram and that he had no scientific proof that Picloram killed the trees on the Property. Begnaud stressed that while Picloram could have been a factor in causing the trees to die, "nobody has enough facts to know unequivocally what killed" the trees. Begnaud stated that no one could say "without a doubt" that Picloram killed the trees and that that was the only standard he could use because he had no way to assign percentages to the various causes such as drought, hypoxylon canker, and exposure to Picloram. Begnaud was insistent that the factfinder understand that, in his opinion, multiple factors contributed to cause the trees to die. Begnaud agreed that, although in his opinion it was unlikely, Picloram could kill live oak trees if sprayed on the leaves, that Picloram can leach into soil and kill susceptible trees such as pecan trees, that you should not spray Picloram underneath the canopy or over the root system of a tree, and that it would be a "good thing" not to spray Picloram immediately upwind of desirable trees.

Walterscheidt and Begnaud, two horticulturists, testified that Picloram can cause injury to oak trees. Begnaud testified that he believed the tree deaths could have been caused by

12

the cumulative effect of stress, secondary disease, an early freeze, and exposure to Picloram. Begnaud stated that he could neither say that, without a doubt, Picloram alone killed the trees nor could he assign a percentage to Picloram's role in killing the trees. Walterscheidt testified that in his opinion, based on his observation of the trees on the Property and his review of the Picloram label, application of that herbicide caused the trees to die. Willard and Ruffin, who are not horticulturists or plant pathologists, provided anecdotal evidence of spraying Picloram on trees with no adverse effects and expressed their opinions that Picloram could only kill an oak tree if it were applied to the tree's stump after cutting. This opinion was based on their interpretation of the product's label, an interpretation that arguably is not supported by the label itself and was contradicted by Walterscheidt and Begnaud.

Reviewing the evidence in the light most favorable to the verdict, as we must in a legal sufficiency review, and mindful of the trial court's role as the sole judge of the credibility of the witnesses, we conclude that the evidence was legally sufficient to support the trial court's findings challenged in sub-issues B and C. Walterscheidt's and Begnaud's testimony provides more than a scintilla of evidence to support the findings, and a reasonable factfinder could have disregarded Willard's and Ruffin's contrary evidence. *See City of Keller*, 168 S.W.3d at 807; *King Ranch*, 118 S.W.3d at 751. We overrule Kerr and Cowpuncher's sub-issues B and C.

In sub-issue H, Kerr and Cowpuncher challenge the trial court's finding that their actions "were the producing cause, proximate cause and resulted in [the Lamberts'] damages." Specifically, Kerr and Cowpuncher assert that there is a "complete absence of evidence that the spraying was the proximate cause of the death of [the Lamberts'] trees." The Lamberts asserted a DTPA claim against Kerr and Cowpuncher, and the trial court's judgment recites that Kerr and Cowpuncher's misrepresentations about the possibility that Picloram could harm their oak

13

trees was "a producing cause" of the economic damages awarded in the judgment.  For DTPA

violations, only producing cause must be shown.  *See* Tex. Bus. & Com. Code § 17.50(a);

*Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160-61 (Tex. 1995); *Doe v. Boys*

*Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995) (for DTPA claims plaintiffs need

only show producing cause and need not establish that harm was foreseeable); *cf. Brown v.*

*Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988) (negligence requires proof of proximate

cause which encompasses both cause in fact and foreseeability).

      While Kerr and Cowpuncher do not expressly challenge the trial court's finding

of producing cause, both proximate cause and producing cause have the common element of

cause in fact.  *Prudential Ins. Co.*, 896 S.W.2d at 161.  This requires proof that an act or

omission was a substantial factor in bringing about an injury that would not otherwise have

occurred.  *Id.*  Kerr and Cowpuncher argue that there is a "complete absence of evidence" that

spraying the trees caused them to die.  As set forth above, however, Walterscheidt, a

horticulturist and plant pathologist, opined that Picloram did in fact cause the trees on the

Property to die.  While Begnaud testified that there were a combination of factors contributing to

the death of the trees, he agreed that Picloram could have contributed in some percentage.  There

was evidence that Kerr and Cowpuncher represented to Robert Lambert that Picloram would not

harm his trees and that Robert Lambert only agreed to hire Kerr and Cowpuncher because of this

representation along with their failure to disclose that Picloram could injure oak trees.  *See Boys*

*Club of Greater Dallas, Inc.*, 907 S.W.2d at 478 (DTPA action requires showing that false,

misleading, or deceptive acts were producing cause of damages).  The finding that the Picloram

harmed trees on the Property was supported by the testimony of both horticulturists, which was

not mere conjecture, guess, or speculation.  The label for Picloram itself cautions that Picloram

can "control" trees, including oak trees. Kerr and Cowpuncher's conduct in assuring Robert Lambert that Picloram was safe for his trees was not too attenuated from the injury to the trees to be a substantial factor in bringing about the harm. *See id.* (cause in fact is not established when defendant's conduct does no more than furnish condition that makes injuries possible). Rather, Lambert testified that without those assurances he would not have hired Kerr and Cowpuncher to spray Picloram on the Property. The evidence presented at trial is legally sufficient to support the trial court's finding regarding producing cause.[3] We overrule Kerr and Cowpuncher's sub-issue H.

### Legal Sufficiency of Finding Related to Kerr's Knowledge

In sub-issue I, Kerr and Cowpuncher challenge the sufficiency of the evidence supporting the trial court's finding that Kerr knew that Picloram could harm live oak trees and that he knew his representation to Robert Lambert that the herbicide would not harm his trees was false. To be actionable under the DTPA, a failure to disclose material information requires that the defendant knew the information but did not disclose it to the plaintiff. *See* Tex. Bus. & Com. Code § 17.46(b)(24) (stating that it is unlawful to fail to "disclose information concerning goods or services which was known at the time of the transaction"). It is also actionable under the DTPA to represent that goods or service have characteristics they do not have, *id.* § 17.46(b)(5), but unlike a DTPA claim based on a failure to disclose, a DTPA claim based on an affirmative misrepresentation does not require that the defendant knew of the falsity

---

[3] Because the trial court awarded the same compensatory damages under the Lamberts' DTPA and negligence causes of action, we need not consider Kerr and Cowpuncher's proximate cause challenge to the Lamberts' negligence claim. *See MBR Assocs., Inc. v. Lile*, No. 02-11-00431-CV, 2012 WL 4661665, at *7 (Tex. App.—Fort Worth Oct. 4, 2012, pet. denied) (mem. op.).

15

of the misrepresentation to establish liability. *See Henry S. Miller Co. v. Bynum*, 797 S.W.2d 51, 55 (Tex. App.—Houston [1st Dist.] 1990) *aff'd* 836 S.W.2d 160 (Tex. 1992). Thus, evidence that Kerr knew his representation to Robert Lambert that Picloram could not hurt his trees was false was not necessary to support the trial court's conclusion that Kerr and Cowpuncher violated section 17.46(b)(5) of the DTPA. However, the trial court found that "[w]hen Kerr represented to [the Lamberts] that the chemicals he was using would not injure [their] trees, he knew that statement was false." In its conclusions of law, the trial court stated that Kerr "knowingly and falsely" represented that Picloram would not harm the Lamberts' trees. Thus, we will review the legal sufficiency of the evidence supporting the trial court's finding that Kerr knew that his statement that Picloram could not harm the Lamberts' trees was false.

Kerr and Cowpuncher argue that there was no evidence at trial that Kerr knew that Picloram would or could kill oak trees. They also point to the testimony of Willard, Kerr, and Ruffin that they had used Picloram extensively and had never known the chemical to injure or kill a mature tree. Kerr and Cowpuncher also refer to Willard's and Ruffin's interpretation of the Picloram label to indicate that the only way Picloram could kill an oak tree is by application to its stump, an interpretation that a reasonable factfinder could have found to be inconsistent with the information on the label itself.

Kerr and Cowpuncher overlook evidence at trial that Kerr was aware of the potential for Picloram to harm trees. Begnaud testified about his questioning of Kerr in 2016 when he visited the Property to investigate what caused the trees to die. Begnaud recounted that:

> I asked what chemical. I asked was it ground, was it aerial, how it was applied. It was told to me that it was ground applied. I asked if he (Kerr) knew that this chemical was capable of causing injuries to trees as the label says, and he said, "Sure."

16

The label on Alligare Picloram 22K identifies it as a "Restricted Use Pesticide" and warns that it "[m]ay injure (phytotoxic) susceptible, non-target plants." The label also states that Picloram controls oak trees, which Begnaud testified means that the product can kill oak trees. Multiple witnesses, including Willard, Ruffin, and Begnaud testified that the product label is "the law" that applies to licensed applicators like Kerr. The label requires that all persons using the product be informed of the precautions included in the label and, as a licensed commercial applicator, Kerr was required to read and become familiar with the label as well as have any people working under him and his license read the label and verify that they had done so by signing and dating the label or by filling out prescribed verification forms. *See* 4 Tex. Admin. Code § 7.31(e) (Tex. Dep't of Agriculture, Supervision).

Kerr also testified that he had a policy of being careful not to spray under the canopies of live oak trees, and the label he was required to be familiar with states:

> Untreated trees can occasionally be affected by root uptake of herbicide through movement into the topsoil or by excretion of the product from the roots of nearby treated trees. Do not apply Alligare Picloram 22K within the root zone of desirable trees unless such injury can be tolerated.

The testimony and exhibits presented at trial provide more than a scintilla of evidence that Kerr knew that Picloram could injure trees. Testimony showed that Kerr told Begnaud that he knew Picloram was capable of causing injury to trees, that he had a policy to avoid spraying under the canopy of trees, and that he was legally required to have read the product's label. This evidence is legally sufficient to support the trial court's finding that when Kerr told Robert Lambert that the chemical he was going to spray on the Property could not hurt the trees he knew that representation was false. We overrule Kerr and Cowpuncher's sub-issue I.

17

*Legal Sufficiency of Evidence Supporting Additional Damages Award*

The trial court awarded the Lamberts $121,950 as compensatory damages to their trees and $30,000 in "additional damages." Under the DTPA, "additional damages" of up to three times the amount of actual damages are allowed if the plaintiff shows that the defendant committed the violation of the DTPA "knowingly." *See* Tex. Bus. & Com. Code § 17.50(b)(1). The trial court found that "$30,000 is an appropriate amount to be awarded in Additional Damages under the DTPA for the knowing violations." In sub-issue J, Kerr and Cowpuncher assert that there is insufficient evidence to support this finding because there was legally insufficient evidence that Kerr knowingly misrepresented that Picloram could not harm the Lamberts' trees. As discussed in addressing sub-issue I, the trial court heard evidence of Kerr's knowledge that Picloram could harm oak trees that was sufficient to support the finding challenged in sub-issue J. Sub-issue J is overruled.

*Challenge to Findings Regarding Training and Supervision of Employees*

Sub-issues D, E, F, and G challenge the following findings made by the trial court:

Defendant Kerr failed to directly supervise the persons working under him on [the Property] as required by law.

Defendant Kerr failed to adequately train and instruct the persons working under him on [the Property] as required by law.

Defendants employed several workers who sprayed the property while not in the presence of Defendant Kerr, and those employees were not properly trained, nor were they licensed handlers of pesticides and herbicides of the type used.

Defendants' unsupervised employees failed to use ordinary care in the application of the herbicide they used, spraying when the wind velocity was too high, spraying chemical high in the air instead of directing the spray on the prickly pear, spraying over the root systems of [the Lamberts'] trees and using more of the herbicide per acre than they should have used.

18

These findings are not necessary to support the judgment rendered on the Lamberts' DTPA cause of action. Rather, they are findings that would support alternative theories of negligence and violations of licensing provisions that make a commercial applicator responsible for the actions of people working under his license. When the judgment rests on multiple theories of recovery, an appellate court need not address all causes of action if any one theory is valid. *See, e.g.*, *ACCI Forwarding, Inc. v. Gonzalez Warehouse P'ship*, 341 S.W.3d 58, 68 (Tex. App.—San Antonio 2011, no pet.). We need not address the sufficiency of the evidence to support alternative theories that support the judgment unless the Lamberts' DTPA claim fails, which we conclude it does not. Consequently, we do not address sub-issues D, E, F, or G.

**Issue Two—Challenges to Conclusions of Law**

In their second issue, Kerr and Cowpuncher challenge several of the trial court's conclusions of law. The challenges are presented as sub-issues A through E. We review a trial court's conclusions of law de novo. *BMC Software*, 83 S.W.3d at 794. When performing a de novo review, we exercise our own judgment and redetermine each legal issue. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 790 (Tex. App.—Houston [14th Dist.] 2016, no pet.). To make this determination, we consider whether the conclusions are correct based on the facts from which they are drawn. *Id.*

The trial court concluded that Kerr and Cowpuncher violated DTPA sections 17.46(b)(5), (7), and (24). In sub-issue A, Kerr and Cowpuncher challenge the trial court's conclusion of law that they violated DTPA sections 17.46(b)(5) and (7). They do not raise a challenge to the trial court's conclusion that they also violated DTPA section 17.46(b)(24). Because one of the Lamberts' DTPA liability theories is sufficient to sustain the judgment, and

19

because liability under 17.46(b)(24) is unchallenged, we need not address the correctness of the trial court's conclusions on the alternative DTPA liability theories found in sections 17.46(b)(5) or (7). *See Checker Bag Co. v. Washington*, 27 S.W.3d 625, 634 (Tex. App.—Waco 2000, pet. denied). We overrule sub-issue A.

In sub-issue B, Kerr and Cowpuncher challenge the trial court's conclusion of law that the Lamberts relied on their misrepresentation that the chemical they would use on the Property would not harm their trees and that such reliance was reasonable. Kerr and Cowpuncher assert that this conclusion of law is incorrect because it "assumes facts that were not in evidence, *i.e.*, that [Kerr and Cowpuncher] made a misrepresentation that the chemical would not harm their oak trees." To the contrary, Robert Lambert testified unequivocally that he asked Kerr whether the chemical he was going to use would possibly hurt the trees and that Kerr told him it would not. This testimony was uncontroverted. Ample evidence at trial showed that, contrary to Kerr's representation, Picloram could harm oak trees. Walterscheidt also testified that, in his opinion, Picloram did kill the trees on the Property. Sub-issue B is overruled.

In sub-issues C and D, Kerr and Cowpuncher argue that the trial court erred when it concluded that Kerr was personally liable for misrepresentations made to Robert Lambert and that Kerr and Cowpuncher are jointly and severally liable for the Lamberts' damages. Kerr and Cowpuncher assert that the evidence does not support "piercing the corporate veil," disregarding Cowpuncher's corporate form, and imposing individual liability on Kerr rather than only on Cowpuncher, a separate corporate entity. After the trial court originally rendered judgment against Cowpuncher alone, the Lamberts filed a motion to modify the judgment and, relying on *Miller v. Keyser*, 90 S.W.3d 712 (Tex. 2002), argued that Kerr, as Cowpuncher's agent, was personally liable for any misrepresentation he made, even if he was acting as agent for a

20

corporation. After hearing argument, the trial court modified its judgment to impose personal liability on Kerr. In *Miller*, the Texas Supreme Court held that an agent for a corporation may be held personally liable for his own violations of the DTPA. *Id.* at 717-18 (agents are personally liable for their own torts and agent may be held personally liable for his own violations of DTPA). Kerr and Cowpuncher do not cite *Miller* in their brief or try to distinguish its holding. Rather, their arguments address piercing the corporate veil and disregarding the corporate form, theories of liability that are inapplicable to the judgment rendered by the trial court in this case. We overrule sub-issues C and D.

In sub-issue E, Kerr and Cowpuncher assert, without any supporting briefing or argument, that the trial court erroneously concluded that the evidence at trial supported recovery on the alternative theories of fraud, negligence, negligent misrepresentation, and breach of contract. The appellate rules require an appellant's brief to contain a clear and concise argument for the contentions made. Tex. R. App. P. 38.1(i). An issue not supported by either argument or authorities is waived. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). Because Kerr and Cowpuncher have provided no argument at all, we find the issue inadequately briefed and decline to address it other than to note that because the judgment can be upheld on the Lamberts' DTPA theory, we would not in any event address challenges to alternative legal theories supporting the judgment. *See* Tex. R. App. P. 47.1 (court of appeals must hand down opinion that addresses issues raised and necessary to final disposition of appeal); *City of San Antonio v. Rodriguez*, 856 S.W.2d 552, 555 (Tex. App.—San Antonio 1993, writ denied).

**Issue Three—Request for Remittitur**

In their third issue, Kerr and Cowpuncher argue that the trial court's damages award represents a double recovery for both temporary and permanent damages and request a remittitur. The trial court awarded the Lamberts $112,500 for diminution in the market value of the Property caused by the damage to the trees and $9,450 for the cost of removing the dead trees. Kerr and Cowpuncher maintain that the $9,450 damage award is for "temporary damages" resulting in a double recovery. In their motion for new trial, Kerr and Cowpuncher asserted that the trial court "did not use the proper measure of calculating damages" and therefore "the Judgment does [not] correctly calculating [sic] damages, if any."

In general, the measure of damages for injury to real property depends on whether the injury is found to be temporary or permanent, which is a question of law. *See Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 480 (Tex. 2014). If damage is found to be permanent, the proper measure of damages is the difference between the value of the land immediately before the injury and its value immediately after. *Id.* at 478-79. If the injury to the land is found to be temporary, the owner is entitled to recover the amount necessary to repair the injury and put the land in the condition it was in at the time immediately preceding the injury. *Id.* Here, the trial court awarded damages of $112,500, the amount it found to be the diminution in the fair market value of the land caused by the loss of the trees. Thus, it is apparent that the trial court found that the injury to the Property was permanent and used a proper measure of damages. *See id.* The trial court also awarded the Lamberts an additional $9,450 as compensatory damages for the cost of removing the dead trees from the Property. Kerr and Cowpuncher argue that this additional award of $9,450 represents a "double recovery" caused by the court awarding damages for both a temporary and a permanent injury to the Property. We disagree. The trial

22

court expressly found that the $9,450 was to compensate the Lamberts for having to remove the dead trees from the land. The trial court did not find that $9,450 was the amount necessary to put the land in the condition it was in at the time preceding the injury. The trial court used a proper measure of damages to compensate the Lamberts for a permanent injury to the Property and, in addition, awarded damages to compensate the Lamberts for the cost of removing dead trees from the Property not because such removal would return the Property to its previous condition but because the cost of removal was an out of pocket expense incurred by the Lamberts because of Kerr and Cowpuncher's DTPA violations. *See* Tex. Bus. & Com. Code § 17.50(b)(1) ("In a suit filed under this section, each consumer who prevails may obtain . . . the amount of economic damages found by the trier of fact."). We overrule issue three.

## CONCLUSION

For the reasons stated in this opinion, we affirm the judgement of the trial court.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: October 23, 2020

23